UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

SOUTHERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA,<br><br>Plaintiff,<br><br>vs.<br><br>AARON MICHAEL VANKLEY,<br><br>Defendant. | 4:18-CR-40044-LLP<br><br><br>REPORT AND RECOMMENDATION |

Defendant Aaron Michael Vankley is before the court on an indictment charging him with possession of a firearm by a prohibited person. See Docket No. 2. Mr. Vankley has filed a motion to suppress. See Docket No. 37, along with an accompanying supporting brief (Docket No. 38). The United States ("government") resists the motion. See Docket No. 39. This matter has been referred to this magistrate judge for holding an evidentiary hearing and recommending a disposition pursuant to 28 U.S.C. § 636(b)(1)(B) and the October 16, 2014, standing order of the Honorable Karen E. Schreier, United States District Judge.

## FACTS

An evidentiary hearing was held on August 22, 2018. Mr. Vankley was present in person along with his counsel, Assistant Federal Public Defender Amanda Kippley. The government was represented by its Assistant United

States Attorney, Tamara Nash.  One witness testified and two exhibits were received into evidence.  From this testimony and these exhibits, the court makes the following findings of fact.

Detective Adam Buiter testified on behalf of the government.  Detective Buiter is a narcotics detective for the City of Sioux Falls.  He is a member of the Sioux Falls Area Drug Task Force.  He was working on December 27, 2017, when the task force executed a search warrant on a trailer home in Sioux Falls. This residence was owned by Rhianna Mathison.

Several (at least eight) officers were present for the execution of the warrant.  There are several reasons it is necessary for that many officers to be present for the execution of a search warrant on a home.  One reason is for officer safety.  There are also many different tasks assigned to the various officers.  One officer is assigned the task of creating a pre-search video; another is assigned the task of being the evidence custodian; as many officers as necessary are assigned to watch over the persons who are found in the home at the time the warrant is executed until those persons can be transported; and of course, several officers actually perform the search.  Not all the officers who are present for a search warrant interact with the people who are found to be present in the home at the time the warrant is executed.

The warrant authorized the search of the residence along with any and all persons present.  When the officers arrived, no one answered the door, so the officers utilized a ram to break through the door and enter the residence. They entered the home at approximately 3:26 p.m.

The officers could hear someone moving about in the master bedroom.  A male (who the officers later identified as Tanner Fromm) exited the bedroom.  The officers handcuffed Mr. Fromm for safety purposes, and detained him in the living room area of the trailer home.

The officers could hear another person moving about in the master bathroom, and could hear a toilet flushing.  From where he was standing in the living room, Detective Buiter could hear a struggle going on in the master bathroom.  Another officer brought Mr. Vankley out of the bathroom and into the living room area.  Mr. Vankley was also handcuffed.  The men were brought to the living room and handcuffed for the duration of the search for officer safety purposes.  Both men were also subjected to a pat-down search.

Detective Buiter explained the men were searched multiple times.  The first time the two men were searched was merely was a pat down search for safety purposes, and the later searches of the two men were more thorough searches.  Detective Scott Nelson made the pre-search warrant video that was received into evidence as Exhibit 1.  The purpose of a pre-search warrant video is to document the condition of the residence.  Another purpose of the pre-search video is to document the people inside the home when the officers make contact. The court has reviewed the pre-search video which was marked as Exhibit 1 during the evidentiary hearing.

At the time the pre-search video was made, Mr. Vankley was already in the living room, seated in a chair.  His jeans pockets were turned inside out.  The officers asked the two men their basic biographical information such as

3

their names and how to spell their names.  The narrator of the pre-search video indicated that certain incriminating items had been found on both Mr. Vankley and Mr. Fromm's persons.  It appears this was the result of the pat down search, because an off-camera officer asks Detective Nelson (the videographer for the pre-search video) to show on camera the items found on Mr. Fromm and Mr. Vankley.

As to Mr. Fromm, the videographer indicates he observed the searching officer remove the incriminating items (a syringe and a large safety pin that field tested positive for methamphetamine, and a small amount of marijuana) from Mr. Fromm's pocket.  During his evidentiary hearing testimony, Detective Buiter indicated he was the officer who searched Mr. Fromm, and that these incriminating items were found in the back pocket of Mr. Fromm's jeans.

Detective Buiter's voice is heard on the video.  The court concludes it is Detective Buiter speaking, because during the evidentiary hearing, defense counsel asked Detective Buiter if he asked Mr. Vankley about whether "weed" was legal in Iowa now.  Detective Buiter conceded that he did ask this question.  On the video, the same person who asked about "weed" being legal in Iowa also stated, as to Mr. Vankley (to whom Detective Buiter refers on the video as Aaron), that Mr. Vankley had a "small amount of marijuana." Detective Buiter did not specify where on Mr. Vankley's person the small amount of marijuana that he wished the videographer to show on the pre-search video was found.  Detective Buiter is also heard on the video, regarding Mr. Vankley, saying "there is more weed in the side of his jacket, but I will just

4

get that out later." During the evidentiary hearing, Detective Buiter mentioned the marijuana found in Mr. Vankley's jacket, but did not mention the small amount of marijuana that was apparently found elsewhere on Mr. Vankley's person that is depicted on the video. On the video, Detective Buiter then asks "is that amount of marijuana legal in Iowa now? They keep changing the rules." Just moments before this statement, but after Mr. Fromm and Mr. Vankley were asked to give their names, a different off-camera officer can be heard making an exclamation about the discovery of a firearm in the residence.

At the evidentiary hearing, Detective Buiter explained the officers conducted a secondary sweep. One of the purposes of a secondary sweep is to make sure there are no more people hiding in the residence. The other purpose of the secondary sweep is to make sure there are no obvious safety issues present in the residence that could harm the officers who are conducting the search. Examples would be weapons or needles that could poke someone. When the officers executed the search warrant, several illegal items were found in the residence including items that field tested positive for methamphetamine, drug paraphernalia items, marijuana, and a firearm. The firearm that is the subject of this criminal prosecution was located in a closet inside the master bathroom. Detective Buiter was not the officer who found the subject firearm, but he believes the firearm was found during the secondary sweep.

5

Detective Buiter did not advise Mr. Vankley of his <u>Miranda</u> rights, because Detective Buiter did not believe he would be asking Mr. Vankley incriminating questions. Detective Buiter asked Mr. Vankley about his personal information and watched over Mr. Vankley during the execution of the search warrant. Mr. Vankley indicated he was on probation, to which Detective Buiter inquired about whether Mr. Vankley had contacted his probation officer. Detective Buiter also engaged in "small talk" with Mr. Vankley. Because both Mr. Vankley and Mr. Fromm had initially been uncooperative, Detective Buiter tried to de-escalate and calm the situation to better allow the officers to do their business. Detective Buiter did not question Mr. Vankley about a firearm. Detective Buiter testified he did not question Mr. Vankley about the drugs that were found in the residence, though he conceded he did ask Mr. Vankley "is marijuana legal in Iowa now?" If Mr. Vankley made any verbal response to this question, it cannot be heard on the pre-search video.

As Detective Christensen was talking to Mr. Fromm about the gun that had been found in the residence, Mr. Vankley stated, "yeah that gun was mine." Detective Buiter turned and looked toward Mr. Vankley to see if Mr. Vankley was going to say anything more about the firearm. Mr. Vankley did not say anything more about the firearm. Detective Buiter explained he did not question Mr. Vankley about the admission because it was not his function to question Mr. Vankley, only to secure him during the search. At the time Mr. Vankley made this admission, other detectives were in the room. Mr. Vankley's statement is not captured on the pre-search video. Detective

6

Buiter explained that the purpose of the video is not to capture statements or interviews of suspects but rather to capture the condition of the home at the time the officers arrive.

When Mr. Vankley said he owned the firearm that was found in the residence, Detective Christensen was speaking with Mr. Fromm who was seated in the living room near Mr. Vankley. Detective Buiter estimated the men were ten to fifteen feet apart. The court has reviewed the video and it appears to the court that the men were seated much closer together than that—more like three or four feet.

Detective Buiter's written report[1] indicates Mr. Vankley made the admission about the firearm while Detective Christensen was speaking with Mr. Fromm about finding the firearm in the home. Detective Buiter testified during the evidentiary hearing that he could not remember whether he actually heard the conversation between Detective Christensen and Mr. Fromm, or whether Detective Buiter learned later from Detective Christensen that this was the subject of the conversation that was occurring between Detective Christenson and Mr. Fromm when Mr. Vankley made the admission about owning the firearm.

Detective Spaeth wrote the arrest report, which was received into evidence as Exhibit A. According to the arrest report, Mr. Vankley made the statement about owning the firearm while he was being searched by Detective

---

[1] Detective Buiter referred to his report to refresh his recollection during the evidentiary hearing. Defense counsel also referred to Detective Buiter's report during cross-examination. The report was not received into evidence.

Buiter. Detective Buiter explained that Mr. Vankley was searched multiple times during the execution of the search warrant on the home. The first search of Mr. Vankley's person was the pat-down search. Mr. Vankley's person was searched at least one more time, and maybe more than that. Detective Buiter could not remember during which search it was that Mr. Vankley made the admission about the firearm.

During the evidentiary hearing, Detective Buiter denied that he could hear everything that was going on in the living room of the trailer. The court does not find this statement credible. But here, the court must distinguish between listening and hearing.

> Hearing is nothing but a sense that helps you receive sound waves and noise by ears. It is the power of perceiving sounds.
>
> On the contrary, listening is when you receive the sound waves and understand it by paying full attention to the words and sentences of the speaker. It is one's ability to correctly receive and interpret the message transferred by the other party in the process of communication

See https://keydifferences.com/difference-between-hearing-and-listening.html (last checked August 23, 2018).

There is no doubt in the court's mind, based on the court's viewing of Exhibit 1, that Detective Buiter could *hear* everything that was being said in the living room of the trailer—maybe even everything that was being said in the entire trailer—during the search. The officers were not exactly whispering. It is also very plausible, however, based on the amount of activity occurring in the compact space, that Detective Buiter could not *listen* to every conversation that was occurring at the same time in the living room. It is entirely possible,

then, given the proximity between Mr. Vankley and Mr. Fromm, that Mr. Vankley listened to the conversation between Detective Christensen and Mr. Fromm, but at the same moment, Detective Buiter was listening to something else.

Though Detective Buiter remembers Mr. Vankley admitting ownership of the firearm, he does not remember what conversation was occurring between Detective Christensen and Mr. Fromm at the time.   Detective Buiter insists, however, that Mr. Vankley did not make the admission in response to a *question* that was posed to Mr. Fromm or anyone else, but instead that Mr. Vankley made the admission while Detective Christensen was simply *telling* Mr. Fromm that the firearm had been discovered in the home.  Because Detective Buiter cannot specifically recall the conversation between Mr. Fromm and Detective Christensen, the court concludes Detective Buiter's conviction regarding the content of the conversation is based upon what Detective Christensen told him.

During the evidentiary hearing, the defense suggested Detective Buiter's testimony was not credible because the arrest report (written by Officer Spaeth) indicates Mr. Vankley's admission was made while Detective Buiter was searching Mr. Vankley, instead of while Detective Christensen was speaking with Mr. Fromm. The Defense emphasized that the pre-search video clearly shows that, before the exclamation about the discovery of the firearm which can be heard by the off-camera officer on the pre-search video is ever heard, Mr. Vankley can be seen on the video with this jeans pockets turned inside out.

9

This, the defense suggests, shows Mr. Vankley had already been searched <u>before</u> the firearm was found in the residence.

Given Detective Buiter's statement that is captured in the pre-search video ("there is more weed in the side of his jacket, but I will just get that out later,") along with Detective Buiter's explanation that Mr. Vankley was searched more than once, the court does not view Detective Buiter's explanation of the timing of Mr. Vankley's admission (when Detective Christensen was speaking with Mr. Fromm) as necessarily inconsistent with Detective Spaeth's recollection (while Detective Buiter was searching Mr. Vankley).  In other words, these two events (1) Detective Buiter removing the weed from Mr. Vankley's jacket during a second or later search; and (2) Detective Christensen speaking with Mr. Fromm, could certainly have been happening simultaneously.

## DISCUSSION

### A.   **Burden of Proof**

"The government bears the burden of proving by a preponderance of the evidence that a defendant's statements were not the product of custodial interrogation."  <u>United States v. Ross</u>, 2018 WL 3091623 at * 11 (N.D. Iowa, Apr. 11, 2018) (citing <u>United States v. Koons</u>, 2001 WL 34008498 at * 8, n.1 (N.D. Iowa, Apr. 26, 2001) (citing <u>Miranda</u>, 384 U.S. at 475))).  In <u>United States v. Sepulveda-Sandoval</u>, 729 F.Supp.2d 1078, 1097-98 (D.S.D. 2010), the undersigned noted that though some district courts had done so, it did not appear the Eighth Circuit had directly spoken on which party bore the burden

10

of proof to show a confession was the result of custodial interrogation—though the issue in that case was custody, not interrogation.  Id.  In that case, the court placed the burden on the government.  The court likewise assigns the burden in this case to the government to prove by a preponderance that Mr. Vankley's statements were made spontaneously rather than as a result of interrogation.

**B.    When Miranda Warnings Are Required**

A Miranda warning is required prior to questioning whenever two conditions are present: (1) the suspect is being interrogated and (2) the suspect is in custody.  Unites States v. Flores-Sandoval, 474 F.3d 1142, 1146 (8th Cir. 2007); Griffin, 922 F.2d at 1347; United States v. Carter, 884 F.2d 368, 371 (8th Cir. 1989).

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980).  Here, neither party disputes that Mr. Vankley was in custody and neither party disputes that Miranda warnings were not given prior to the admission Mr. Vankley made to the officers regarding his ownership of the firearm which was found in the residence.

Thus, whether Mr. Vankley's admission should be suppressed pursuant to the rule in the Miranda case depends on whether Mr. Vankley's admission

was made in response to the officers' interrogation of Mr. Vankley, and whether Mr. Vankley's admission was voluntary.[2]

## C.    Mr. Vankley's Statements Were Not the Result of Interrogation

Interrogation includes direct questioning or any practice reasonably likely to evoke an incriminating response from a suspect.  See Rhode Island v. Innis, 446 U.S. 291, 301 (1980); see also United States v. Head, 407 F.3d 925, 925 (8th Cir. 2005) ("Interrogation includes not only express questioning by law enforcement officers, but also words or actions that officers should know are reasonably likely to elicit an incriminating response from a suspect.").

The "words or actions" of the police must be outside the scope of words and actions that normally accompany the arrest and taking into custody of a defendant.  United States v. Wipf, 397 F.3d 677, 685 (8th Cir. 2005) (citing Innis, 446 U.S. at 301).  "A statement made by a suspect that is voluntary and not in response to interrogation is admissible with or without the giving of Miranda warnings."  Head, 407 F.3d at 925.  A request for routine information for basic identification purposes is not interrogation.  United States v. Cowan, 674 F.3d 947, 958 (8th Cir. 2012) (citing United States v. Brown, 101 F.3d 1272, 1274 (8th Cir. 1996)).

This exception does not apply, however, if the officer should reasonably be aware that the information sought is directly relevant to the substantive

---

[2] Whether Mr. Vankley's admission was voluntary was not an issue that was briefed by the parties.  This issue was raised orally by defense counsel during the evidentiary hearing.

12

offense charged.  Cowan, 674 F.3d at 958 (citing United States v. McLaughlin, 777 F.2d 388, 391-92 (8th Cir. 1985)).

"Miranda does not bar the government from introducing into evidence spontaneous statements made during a conversation not initiated by the officer." United States v. Chipps, 410 F.3d 438, 445 (8th Cir. 2005).  In addition, polite conversation between the police and a defendant that is not steered "toward potentially incriminating topics" "is not the functional equivalent of interrogation." United States v. Tail, 459 F.3d 854, 858 (8th Cir. 2006); see also United States v. Fleck, 413 F.3d 883, 893 (8th Cir. 2005).

In Innis, 446 U.S. at 302, the United States Supreme Court held that a conversation between two police officers in the presence of a Mirandized suspect did not amount to interrogation.  Id.  The suspect, Mr. Innis, had been arrested in connection with the robbery of a taxicab driver.  Id. at 293.  The weapon used in the robbery was a sawed-off shotgun.  Id.  A few days earlier, another taxicab driver had disappeared after being dispatched to pick up a customer.  His body was later found, having been killed by a shotgun blast to the head.  Id.  The second cab driver reported to the police station to give a description of the man who had robbed him, and identified a photo of Mr. Innis.  Id.  Mr. Innis was arrested after he was spotted on the street by a patrolman.  Id. at 294.

Mr. Innis was advised of his Miranda rights at least twice before he was transported to the police station.  Id.  Mr. Innis indicated he wanted to speak with a lawyer.  Id.  En route to the station, the two officers in the patrol car did

not directly address Mr. Innis, but they had a conversation in the patrol car between themselves regarding the shotgun that had been used during the robbery, which had not been found.

One patrolman remarked to the other that the area where the second taxicab robbery had occurred was near a school for handicapped children, and "God forbid one of them might find a [loaded] weapon and hurt themselves." Id. at pp. 294-95. The other officer concurred, remarking they should continue to search for the weapon. Id. at p. 295. The second officer went even further, expressing concern that "it would be too bad if . . . a little girl would pick up the gun, maybe kill herself." Id. At that point, Mr. Innis interrupted the conversation and told the officers to turn the patrol car around so he could show the officers where the gun was located. Id. They returned to the scene of the crime, and Mr. Innis was again advised of his Miranda rights, but Mr. Innis indicated he wanted to get the gun out of the way because of the children in the area. Id.

Mr. Innis was convicted of several counts, including kidnapping, robbery, and the murder of the first taxicab driver. He unsuccessfully moved to suppress the shotgun and statements he made to the patrol officers. Id. at 296. On appeal to the Rhode Island Supreme Court, however, that court found that the conversation between the patrol officers amounted to an interrogation of Mr. Innis, and set aside Mr. Innis's conviction. Id. The United States Supreme Court disagreed.

14

The Court explained that the <u>Miranda</u> safeguards come into play whenever a person in custody is subjected to "express questioning or its functional equivalent." <u>Id.</u> at 300-01.  This includes "any words or actions on the part of the police . . . that the police should know are reasonably likely to elicit an incriminating response from the suspect." <u>Id.</u> at 301.

> But since the police surely cannot be held accountable for the unforeseeable results of their words or actions, the definition of interrogation can extend only to words or actions on the part of police officers that they *should have known* were reasonably likely to elicit an incriminating response.

<u>Id.</u> at 302.  Concluding that what occurred did not fit the definition, the Court noted that (1) the conversation was nothing more than a dialogue between the two officers to which no response from Mr. Innis was invited; and (2) it could not be fairly concluded that Mr. Innis was subjected to the functional equivalent of questioning, because the patrolmen couldn't have known that their conversation was reasonably likely to elicit an incriminating response from Mr. Innis.  <u>Id.</u>  This was so because there was nothing in the record to show Mr. Innis was particularly susceptible to an appeal to his conscience regarding the safety of handicapped children, or that the patrolmen knew Mr. Innis was unusually disoriented or upset at the time of his arrest.  <u>Id.</u> at 302-03.

> This case thus boils down to whether, in the context of their brief conversation, the officers should have known that the respondent would suddenly be moved to make a self-incriminating response. Given the fact that the entire conversation appears to have consisted of a few off-hand remarks, we cannot say that the

officers should have known that it was reasonably likely that Innis would so respond.

Id. at 303.

In United States v. Cordova, 990 F.2d 1035, 1036-38 (8th Cir. 1993), police obtained a search warrant for, *inter alia*, Mr. and Mrs. Cordova's residence. Id.  When they arrived to execute the search warrant, the officers arrested Mr. Cordova and asked him whether there were drugs in the house. Id.  He told the officers he had a "personal stash" of heroin in the bedroom. Id. The officers retrieved the heroin from the bedroom and then approached Mrs. Cordova, who was sitting in the living room. Id.  They asked her if her husband had any additional heroin anywhere in the house.  Id.  Mrs. Cordova subsequently informed officers that she had drugs hidden inside her vagina. Id.  Later, she moved to suppress her statements pursuant to Miranda. Id.  The Eighth Circuit refused to suppress, noting that the officer had asked her about additional drugs related to *her husband*, not Mrs. Cordova. Id.  The fact that Mrs. Cordova then identified drugs which *she herself* possessed was characterized by the court as a voluntary statement, not a response to interrogation likely to produce an incriminating response as to her. Id.  In such a case, where the statement itself was uncoerced, the court held Miranda has no application.  Id.

In United States v. Hawkins, 102 F.3d 973, 975 (8th Cir. 1996), the defendant, Mr. Hawkins, moved to suppress the statements he made to police officers during the search of his home.  Id. at 975.  The Little Rock, Arkansas, police had obtained information from an informant that Mr. Hawkins was

dealing crack cocaine out of his home.  Id. at 974.  The police obtained a warrant to search Mr. Hawkins' home, and entered the home without knocking or announcing.  Id.  Mr. Hawkins was present at the time of the search.  Id. The officers handcuffed Mr. Hawkins upon entry to the home, placing him on the floor.  Id.

Detective King, a member of the search team, knew Mr. Hawkins from a previous encounter and helped handcuff Mr. Hawkins upon entry to the home. As he was being handcuffed, Mr. Hawkins said to Detective King, "King, there ain't nothing in my house."  Id.   Detective King replied to Mr. Hawkins, telling Mr. Hawkins that officers knew there were drugs in the house and that Mr. Hawkins could "make it easier on himself" if he told the officers where the drugs were located.  Id.

In response to this statement by Detective King, Mr. Hawkins repeated his denial that there were any drugs in the house.  Id. Shortly thereafter, another member of the search team located 3.8 grams of crack cocaine hidden in a potted plant.  Id. at 975.  Only after the drugs were discovered, Mr. Hawkins (without any further questioning or prompting by police) asked to speak privately with Detective King.  Id.  Once alone with Detective King, Mr. Hawkins asked "what can I do to help myself?  I got to help myself."  Then Mr. Hawkins volunteered that he was only selling small quantities of cocaine, and he proceeded to name two of his suppliers.  Id.  He also offered to cooperate with the police to secure their arrests.  Id.  Mr. Hawkins had not been advised of his Miranda rights before he made these incriminating statements.  Id.

17

The government conceded Mr. Hawkins was in custody when he made the incriminating statements.  Id.  The issue, however, was whether Mr. Hawkins' statements were made as the result of a custodial *interrogation.* Id.  The court explained that Mr. Hawkins initiated the conversation by telling Detective King there were no drugs in the home, but that King had responded by telling Mr. Hawkins police knew there were drugs in the house, and Hawkins would make things easier for himself by disclosing the location of the drugs.  Id.  Mr. Hawkins responded by repeating his denial—after which Detective King said nothing more.  Id.  Detective King was there to search, not to interrogate Mr. Hawkins, and that is what he proceeded to do. Id.  The court reasoned that "King's brief exchange with Hawkins, prompted by the latter's exculpatory assertion, was not interrogation because this was not a situation in which King 'should have known [that his words] were reasonably likely to elicit an incriminating response.' " Id. (quoting Innis, 446 U.S. at 303). Furthermore, the court reasoned, Mr. Hawkins did not make his incriminating statements until after the drugs were found.  Before the drugs were found, Mr. Hawkins persisted in his denial of their presence despite Detective King's initial conversation with Mr. Hawkins.  Hawkins, 102 F.3d at 975.  It was the discovery of the drugs, therefore, not police coercion, that induced the incriminating statements. Id.

In United States v. Hayes, 120 F.3d 739, 744 (8th Cir. 1997), the defendant, Ms. Top Bear, moved to suppress her non-Mirandized statements to police.  Id.  Ms. Top Bear and her husband, Mr. Hayes, were suspects in a

recent bank robbery which had occurred in Niobrara, Nebraska.  Id. at 740. Ms. Top Bear arrived at her home at 11:00 p.m. while officers were executing a search warrant on her home.  Id. at 741.  An officer who was present began to explain to Ms. Top Bear what was happening, and that he would later be asking her about her whereabouts earlier in the day.  To this, Ms. Top Bear offered that she had been in Yankton, South Dakota, during the day.  These statements by Ms. Top Bear were in direct conflict with statements made by the friend who was with her when she arrived at the home (Paula Larson).  Id. Ms. Larson told police that Ms. Top Bear arrived at her friend (Paula's) home on foot at about 9:30 p.m. on the day of the robbery, indicating she'd been driving her mother's car, but it broke down near Lynch, Nebraska.  Id.  Ms. Top Bear told her friend Paula that she'd walked from Lynch, Nebraska, to Paula's home (nearly 30 miles).  Id.

The trial court denied Ms. Top Bear's motion to suppress the statement she made to police upon arriving at her home that she'd been in Yankton on the day of the bank robbery.  Id. at 744.  The trial court found this statement had been spontaneously or voluntarily made by Ms. Top Bear, and was therefore not made in violation of Miranda.  Id.  The Eighth Circuit agreed.  Id. The court explained that the officer "had not yet asked Top Bear to explain her whereabouts during the day.  He explained he *wanted to ask her some questions* concerning the events of the day and asked her to step inside so he could advise her of her rights before questioning her."  Id.  The court noted that when Ms. Top Bear announced she had been in Yankton, the officer

immediately stopped her and advised her of her rights.  Id.  Under these circumstances, the court held, Ms. Top Bear's statements were not induced by the investigating officers but instead were the result of a spontaneous admission.  Id.

In Louisell v. Director of Iowa Dept. of Corrections, 178 F.3d 1019, 1023-1024 (8th Cir. 1999), a juvenile was arrested and taken to the police station. Id.  Once there, police called the juvenile's grandmother and legal guardian to request permission to interrogate the juvenile.  Id.  The grandmother granted the police her permission, and then asked to speak with the juvenile.  Id.  The juvenile was allowed to speak on the phone to her grandmother, during which conversation she made incriminating remarks within earshot of the police.  Id. The juvenile moved to suppress these statements, arguing that her statements should be suppressed pursuant to Miranda because handing the phone to the juvenile in the presence of police was the "functional equivalent" of interrogation.  Id.  The Eighth Circuit rejected this argument, noting that the officers did not call the grandmother in an attempt to elicit statements from the juvenile and that the police did not subject the juvenile to "compelling influences, psychological ploys, or direct questioning."  Id.

In United States v. Hunt, 372 F.3d 1010, 1012-13 (8th Cir. 2004), officers identified themselves to the defendant and asked the defendant if he would be willing to cooperate with law enforcement.  Id.  The defendant then offered the police money as a bribe.  Id.  The defendant argued that his bribe offer should be suppressed pursuant to Miranda as the product of custodial

interrogation. Id.  The Eighth Circuit refused, noting that the defendant's bribe

offer "was not made in response to any question the [police] asked."  Id.

In United States v. Swift, 623 F.3d 618, 622-23 (8th Cir. 2010), the

Eighth Circuit held that placing two defendants alone in a room together and

recording their conversation without telling the defendants that they were

being recorded was not "interrogation" within the meaning of Miranda. (citing

United States v. Hernandez-Mendoza, 600 F.3d 971, 977 (8th Cir. 2010) (two

defendants placed alone together in a police car with recording device

activated)).

These cases provide the foundation for the court's consideration of

Mr. Vankley's motion to suppress.  The court assumes Mr. Vankley could hear

and was listening to the conversation occurring between Mr. Fromm and

Detective Christensen.  The evidence in the record, however, clearly shows that

Detective Christensen was speaking to Mr. Fromm about the firearm and was

not speaking to Mr. Vankley.  It makes no difference to the analysis here

whether Detective Buiter was listening to the Fromm/Christensen conversation

or whether he learned the subject of the conversation later from Detective

Christensen for purposes of putting it in his (Buiter's) report.  Hearsay is

admissible in evidentiary hearings on motions to suppress.   United States v.

Thompson, 533 F.3d 964, 969 (8th Cir. 2008).

Even assuming Mr. Vankley heard Detective Christensen tell or question

Mr. Fromm about the discovery of the firearm in the home, the officers could

not have reasonably have been expected to know that such a conversation

between      Mr. Fromm and Detective Christenson would prompt Mr. Vankley to "suddenly be moved to make a self-incriminating response." Innis, 446 U.S. at 303.  There is no evidence that either Detective Christensen or Detective Buiter were even talking to Mr. Vankley, let alone questioning him, at the time he made the admission.  See Innis 446 U.S. at 303.  Further, there is nothing in the record to suggest the officers knew Mr. Vankley was "particularly susceptible" to an appeal to his conscience, should the officers begin speaking with Mr. Vankley's cohort about the presence of a firearm in the home. Finally, there is nothing in the record to suggest the officers were aware that Mr. Vankley, at the time of his arrest, was unusually disoriented or upset at the time he was arrested.  Id.  To the contrary, the record reflects Mr. Vankley had the wherewithal to attempt to flush the evidence down the toilet upon the officers' arrival to execute the search warrant.

The court observes that, even when a suspect *is* directly questioned, but questioned about the involvement of a third party, the Eighth Circuit has found no interrogation occurred.  See Cordova, 990 F.2d at 1036-38.  In that case, because Mrs. Cordova was being questioned about her husband, the court reasoned, the officers could not have reasonably known that their questions would elicit an incriminating response from Mrs. Cordova about her own culpability.  Id. at 1037.  No interrogation therefore occurred.  Id. at 1038.

The court has found no case, and Mr. Vankley cited none, in which a suspect has successfully argued that a police officer's conversation or questioning of a third party was deemed an interrogation of the suspect

himself.  In order for interrogation to take place, there must be questions or conduct directed to the suspect himself which is likely to elicit an incriminating response.  Where the questions or comments are within the suspect's hearing but are not directed to the suspect, as in Innis, there is no interrogation.  The court finds Detective Christensen's conversation with Mr. Fromm about the firearm did not rise to the level of "express questioning or its functional equivalent" of Mr. Vankley.  No Miranda violation occurred.

**D.     Mr. Vankley's Admission Was Voluntary**

During the hearing, Mr. Vankley asserted that even in the absence of a Miranda violation, his admission should be suppressed because it was involuntary.  Though this issue was only raised during the hearing, in the interest of completeness, the court addresses it.

The Supreme Court has stated that, under the Due Process Clause of the Fifth and Fourteenth Amendments, "certain interrogation techniques, either in isolation or as applied to the unique characteristics of a particular suspect, are so offensive to a civilized system of justice that they must be condemned." Miller v. Fenton, 474 U.S. 104, 109 (1985) (citing Brown v. Mississippi, 297 U.S. 278 (1936)).  "In considering whether a confession was voluntary, the determinative question is whether the confession was extracted by threats, violence, or promises (express or implied), such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired."  United States v. Pierce, 152 F.3d 808, 812 (8th Cir. 1998) (citing Sumpter v. Nix, 863 F.2d 563, 565 (8th Cir. 1988) (citing Culombe v.

23

Connecticut, 367 U.S. 568, 602 (1961))).  The court must look to the totality of the circumstances, "including the conduct of the law enforcement officials and the defendant's capacity to resist any pressure."  Id.  See also Withrow v. Williams, 507 U.S. 680, 688–89 (1993) (continuing to adhere to the totality of circumstances test).  See Dickerson v. United States, 530 U.S. 428, 434 (2000) ("The due process test takes into consideration 'the totality of all the surrounding circumstances—both the characteristics of the accused and the details of the interrogation.' ").  The burden of demonstrating that a defendant's statement was voluntary rests with the government, which must prove voluntariness by at least a preponderance of the evidence.  Missouri v. Seibert, 542 U.S. 600, 608 n.1 (2004).

The Supreme Court has made clear that "coercive police activity is a necessary predicate to the finding that a confession is not 'voluntary' within the meaning of the Due Process Clause of the [Fifth or] Fourteenth Amendment."[3] Colorado v. Connelly, 479 U.S. 157, 167 (1986).  That is because a *prima facie* showing of a due process violation must include a showing of some sort of *state action*.  Connelly, 479 U.S. at 165–66.  Therefore, a defendant's mental status alone can never result in a finding that his statement was involuntary without some form of police overreaching.  Id.

---

[3]"Although Connelly arose under the Due Process Clause of the Fourteenth Amendment, whereas the instant case appears to implicate the Fifth Amendment, the analysis in the Connelly decision has been extended to apply to involuntary confession claims arising under the Fifth Amendment as well." United States v. Bad Hand, 926 F. Supp. 891, 899 n.10 (D.S.D. 1996).

However, this does not mean that a defendant's mental status is irrelevant to the question of whether his statement was voluntary. A defendant's mental status is still relevant under the totality of circumstances test to the extent the evidence shows that the police were aware of that mental status and acted in some way to exploit it. See United States v. Makes Room For Them, 49 F.3d 410, 415 (8th Cir. 1995) (holding that totality of circumstances requires consideration of defendant's age, education, and experience insofar as police knew those facts); Townsend v. Sain, 372 U.S. 293, 298–99 (1963) (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant), overruled on other grounds Keeney v. Tamayo-Reyes, 504 U.S. 1 (1992);[4] (defendant's statement was involuntary when obtained following the police's administration of a truth serum to defendant); Blackburn v. Alabama, 361 U.S. 199, 207–08 (1960) (defendant's statement was involuntary where police were aware of defendant's history of mental problems, knew that he was probably insane, and proceeded with interrogation).

Where a defendant suffered from some mental infirmity and police were unaware of that infirmity, courts have found the necessary state action to be missing. Connelly, 479 U.S. at 160–61, 164–65 (confession not coerced where defendant exhibited no sign of mental illness to police, but where defendant in fact confessed because "voices" commanded him to confess); see also United

---

[4] Keeney was in turn superseded by statute. See Williams v. Taylor, 529 U.S. 420, 432–33 (2000) (discussing the enactment of 28 U.S.C. § 2254).

States v. Rohrbach, 813 F.2d 142, 144–45 (8th Cir. 1987) (confession was voluntary despite defendant's minimal formal education, history of drug and alcohol abuse, and suicide attempts where there was no corresponding coercive actions on the part of police).

The existing precedent outlines the type of police conduct that courts have found to be coercive.  The conduct includes extreme duration and conditions of detention, the manifest attitude of police toward the defendant, pressures which sap or sustain a defendant's powers of resistance or self-control, and exploiting a defendant's mental and physical state.  See Colorado v. Spring, 479 U.S. 564, 574 (1987) (quoting Culombe, 367 U.S. at 602 (opinion of Frankfurter, J.)); Davis v. North Carolina, 384 U.S. 737, 739–53 (1966) (defendant held for sixteen days of incommunicado interrogation in a closed cell without windows); Blackburn, 361 U.S. at 207–08 (defendant was probably insane at the time of his confession, police knew defendant had a history of mental problems, police questioned defendant for eight to nine hours of sustained interrogation in a tiny room literally filled with police, police isolated defendant from friends, relatives, or legal counsel); Reck v. Pate, 367 U.S. 433, 436–44 (1961) (defendant held for four days with inadequate food and medical attention until confession obtained); Culombe, 367 U.S. at 625–26 (1961) (defendant held for five days of repeated questioning during which police employed coercive tactics); Payne v. Arkansas, 356 U.S. 560, 561–68 (1958) (defendant held incommunicado for three days with little food and threats that a lynch mob would be admitted into the jail); Ashcraft v. Tennessee, 322 U.S.

26

143, 153–55 (1944) (defendant questioned by relays of officers for 36 hours without sleep).  It is this body of law which the court applies to Mr. Vankley's assertion that his admission was involuntary.

Based on the legal analysis of <u>Connelly</u> and its progeny, the court considers all the facts and circumstances surrounding Mr. Vankley's statement in determining whether that statement was voluntary.  <u>See</u> <u>Withrow,</u> 507 U.S. at 688–89; <u>Arizona v. Fulminante</u>, 499 U.S. 279, 285–86 (1991); <u>Miller v. Fenton</u>, 474 U.S. 104, 109–10 (1985); and <u>United States v. Plumman</u>, 409 F.3d 919, 925 (8th Cir. 2005) (holding that "recap" statement was voluntary when two FBI agents used "rapport building" technique to interview suspect).  In this context, the court also considers Mr. Vankley's personal characteristics to the extent they were known to the agents.  <u>Blackburn</u>, 361 U.S. at 207–08; <u>Makes Room For Them</u>, 49 F.3d at 415; <u>Jenner v. Smith</u>, 982 F.2d 329, 333 (8th Cir. 1993).

There is no evidence to suggest coercion by the police officers present in the residence during the search.  There is no evidence that Mr. Vankley was detained for an extreme amount of time, or that the conditions of his detention were extreme.  Detective Buiter testified that though there were several officers present in the trailer home during the search, not all of the officers who were present had occasion to interact with Mr. Vankley.  He was handcuffed, but he was seated in a chair and there was no evidence presented that he was mistreated in any way by the officers who were watching over him.  There was no evidence presented that Detectives Buiter and Christensen were anything

other than cordial and polite toward Mr. Vankley.  There was no evidence

presented that there was anything at all going on which would have sapped

Mr. Vankley's powers of resistance or self-control, or that exploited his mental

or physical state.  There is simply nothing in this record that suggests police

coercion.  See Spring, 479 U.S. at 574. In the absence of police coercion, there

can be no finding that Mr. Vankley's statement was involuntarily made.

Connelly, 479 U.S. at 165–66.

    In the absence of police coercion, Mr. Vankley's mental state is irrelevant

to the inquiry unless the officers knew Mr. Vankley to be suffering from some

mental infirmity, then took advantage of the infirmity to obtain the confession.

Connelly, 479 U.S. at 160–61; Rohrbach, 813 F.2d at 144–45.  There is no

evidence that Mr. Vankley had any particular susceptibility to incriminate

himself, or that police took advantage of the knowledge that he did.

    United States v. LeBrun, 363 F.3d 715 (8th Cir. 2004) is also instructive.

In that case, police had questioned LeBrun on four prior occasions in the fall of

1999 regarding the death of an ensign in 1968 while both LeBrun and the

ensign were aboard a United States Navy vessel during the Vietnam War.  Id. at

717–18.  During the fifth interrogation, one year later, LeBrun finally confessed

to murder.  Id. at 726–27.

    On the occasion of this fifth interrogation, officers showed up at LeBrun's

place of employment unexpectedly and said they wanted to question him about

an investigation, not telling him that it was the matter of the ensign's death.

Id. at 718.  LeBrun mistakenly believed that he was going to be questioned

28

about criminal allegations involving LeBrun's employer.  Id.  LeBrun rode to the police station in a police vehicle.  Id.  After arriving at the station, LeBrun was advised that he was not under arrest and could leave at any time, but he was not given full Miranda warnings.  Id.

LeBrun was then led into a windowless interview room which police had prepared by adorning the walls with enlarged photographs of scenes from LeBrun's life.  Id.  The officers used psychological ploys against LeBrun, telling him that he was the prime suspect in the ensign's death, that the police had significant evidence that LeBrun was the killer, and that a protracted trial would drain LeBrun's financial resources and would ruin his family's reputation.  Id.  The officers also suggested, without outright promising, that LeBrun could not be prosecuted due to the passage of so much time.  Id. at 725–26.  LeBrun confessed after thirty-three minutes of interrogation.  Id. at 718–19.  The court held that the confession was voluntary.  Id. at 727.

The court reasoned that neither of the officers was armed during the interrogation, the agents never raised their voices, nor did they physically threaten Mr. LeBrun.  Id. at 724.  The psychological tactics alone, the court reasoned, did not render the confession involuntary.  Id.  This was because nothing the agents said or did rose to the level of overbearing Mr. LeBrun's will or critically impairing his capacity for self-determination.  Id. at 726.  The court placed great weight on the fact that there was no indication Mr. LeBrun was "particularly suggestible and susceptible to having his will overborne."  Id.

Here, like the defendant in <u>LeBrun</u>, Mr. Vankley did not receive <u>Miranda</u> warnings before he made an incriminating statement.[5]  But Mr. Vankley, unlike Mr. LeBrun, was not subjected to any direct questioning save a few benign biographical questions and a flippant question about the legality of "weed" in Iowa.  Otherwise, he just sat, handcuffed, while a search warrant was executed in a home that belonged to someone else.

There is no evidence in the record concerning any special weaknesses of Mr. Vankley's.  There is no evidence in the record that Mr. Vankley suffers from low intelligence, a mental disease or defect, or any other handicap that would have made him unusually or peculiarly susceptible to having his free will overborne.  His conduct on the pre-search video reveals no such infirmities.

Clearly, the presence of multiple officers in the small trailer home, and having to sit through the execution of a search warrant while handcuffed, was surely somewhat coercive in and of itself, even in the absence of direct questioning (i.e. interrogation) by the arresting officers.  However, the Eighth Circuit has stated that "some degree of coercion is part and parcel of the interrogation process." <u>LeBrun</u>, 363 F.3d at 721.  The question is not whether there was *any* coercion at all, but whether the coercion was "such that the defendant's will was overborne and his or her capacity for self-determination was critically impaired." <u>United States v. Pierce</u>, 152 F.3d 808, 812 (8th Cir. 1998) (citing <u>Sumpter v. Nix</u>, 863 F.2d 563, 565 (8th Cir. 1988) (citing

---

[5] The court in <u>LeBrun</u> ultimately held that (unlike Mr. Vankley) Mr. LeBrun was not in custody.  <u>LeBrun</u>, 363 F.3d at 724.

Culombe, 367 U.S. at 602)).  The court concludes that, under the totality of the circumstances, Mr. Vankley made his statement on December 27, 2017, voluntarily and of his own free will.

## CONCLUSION

Based on the foregoing facts, law, and analysis, this magistrate judge respectfully recommends that Mr. Vankley's motion to suppress [Docket No. 37] be DENIED.

## NOTICE TO PARTIES

The parties have fourteen (14) days after service of this Report and Recommendation to file written objections pursuant to 28 U.S.C. § 636(b)(1), unless an extension of time for good cause is obtained.  Failure to file timely objections will result in the waiver of the right to appeal questions of fact. Objections must be timely and specific in order to require de novo review by the District Court.  Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990); Nash v. Black, 781 F.2d 665 (8th Cir. 1986).

DATED this 28th day of August, 2018.

BY THE COURT:

VERONICA L. DUFFY
United States Magistrate Judge

31